**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AMERICAN INFERTILITY OF NEW YORK, P.C. D/B/A CENTER FOR HUMAN REPRODUCTION and NORBERT GLEICHER, M.D., | Case No.: 25-CV-05221 |
| Plaintiffs, | COMPLAINT |
| – against – | |
| KINDBODY, INC., KBI SERVICES, INC., and EMPIRE MEDICAL PRACTICE, P. C., | JURY TRIAL DEMANDED |
| Defendants. | |

Plaintiffs American Infertility of New York P.C., d/b/a Center for Human Reproduction ("CHR") and Norbert Gleicher, M.D. ("Dr. Gleicher") (collectively, "Plaintiffs"), by and through their counsel, Turman Legal Solutions P.C., as and for their Complaint against Defendants Kindbody, Inc., KBI Services, Inc., and Empire Medical Practice, P.C. (collectively referred to as "Kindbody" or "Defendants"), allege as follows:

## NATURE OF THE ACTION

1.     This is an action for defamation per se, trade libel, false advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), deceptive business practices in violation of New York General Business Law §§ 349 and 350, and tortious interference with prospective business relations arising from Defendants' intentional and calculated campaign to impugn the reputations of CHR and its founder and Medical Director, Dr. Gleicher, a world-renowned pioneer in reproductive medicine.

2.     Dr. Gleicher is a board-certified obstetrician-gynecologist and pioneer in the field of Reproductive Endocrinology and Infertility ("REI").  In 1983, Dr. Gleicher performed the world's first successful transvaginal ultrasound-guided oocyte retrieval for in vitro fertilization (IVF), that was published in The Lancet and is the gold standard used today.  Dr. Gleicher has held

1

full professorships at the Chicago Medical School, New York University School of Medicine and Yale University School of Medicine, and served as an adjunct professor at the Medical University of Vienna. CHR is a research clinic founded by Dr. Gleicher and is internationally recognized as a "center of last resort" for patients with challenging infertility cases who have failed treatments elsewhere.

3.    Defendants operate a vertically integrated enterprise that occupies both sides of the fertility services marketplace. On one hand, Defendants act as third-party administrators ("TPA") of fertility benefits plans for numerous large corporations, including Tesla, Inc., SpaceX, Walmart, Inc., and Lyft, Inc. In this role, Defendants are responsible for approving patient benefits and paying fertility providers for over 2.7 million employees enrolled in the administered plans. As TPAs under the Employee Retirement Income Security Act of 1974 ("ERISA"), Defendants owe strict fiduciary duties to plan members, requiring them to act exclusively in members' best interests and prohibiting any self-dealing or conflicts of interest.

4.    On the other hand, Defendants own and operate approximately 33 "Signature Kindbody" fertility clinics and laboratories strategically positioned in major markets, and maintain financial partnerships with over 400 additional clinics nationwide, collectively forming the "Kindbody Network." Through these dual roles, Defendants have substantial financial incentives to steer patients enrolled in the plans they administer toward their own clinics and affiliated facilities, thereby earning profits both as administrators and medical service providers

5.    CHR currently treats a patient (the "Patient") employed by Tesla, Inc., a company that offers a self-insured reproductive health benefits plan (the "Plan") administered by Defendants. The Patient consulted Plaintiffs and agreed to proceed with infertility treatment

provided by CHR. Pursuant to the terms of the Plan, the Patient retains the right to utilize her fertility benefits at any provider of her choosing without restriction or penalty.

6.    On or about May 20, 2025, the Patient contacted Defendants, via email, requesting authorization for her care to be covered under the Plan and explicitly identifying CHR as her chosen provider.

7.    In response to Patient's request for the use of her plan benefits to pay for Plaintiffs' medical services, one Defendants' "Patient Care Navigators" sent an email to Patient that contained several false factual statements about Plaintiffs, including: (a) "the founding doctor [Dr. Gleicher] at the Center for Human Reproduction is obviously an experienced practitioner in this field but is not specifically trained as a Reproductive Endocrinologist"; (b) "this practice promotes unorthodox methods and cycle types"; (c) "perhaps most importantly, the SART[1] scores they report are consistently far below the national average"; and (d) "this provider group does not meet criteria to be included in Kindbody's Network."

8.    Each statement of fact made by Defendants about Plaintiffs is false or materially misleading and was presented to the Patient under the guise of "keeping [her] informed on matters of clinical quality."

9.    Defendants' actual purpose in disseminating these defamatory statements was to improperly steer or "navigate" the Patient toward "Signature Kindbody" clinics, which Defendants either wholly own or financially benefit from—a financial conflict Defendants knowingly and intentionally failed to disclose to the Patient. In fact, the same email exchange included a list of

---

[1]The Society for Assisted Reproductive Technology ("SART") is a professional organization in the United States that supports and promotes the practice of assisted reproductive technology ("ART"), such as in vitro fertilization ("IVF"). Founded in 1985, SART sets standards for ART clinics, collects and publishes data on ART outcomes, and provides resources for patients, clinicians, and researchers. It works to improve the safety, efficacy, and accessibility of fertility treatments. SART's member clinics report data annually, which is used to create national and clinic-specific success rate reports, helping patients make informed decisions.

recommended "Signature Kindbody" clinics, explicitly encouraging the Patient to seek treatment at a Kindbody-owned facility.

10.     The Patient fortuitously forwarded the email exchange with Defendants to CHR, enabling Plaintiffs to uncover Defendants' covert and improper conduct. Without this disclosure, Defendants' misuse of their TPA role to defame and disparage Plaintiffs and steer patients away would have remained concealed, perpetuating undetected reputational and financial harm.

11.     Upon discovering Defendants' defamatory and unlawful conduct, Plaintiffs promptly issued a cease and desist letter to Defendants on May 22, 2025, demanding, among other actions, a comprehensive written retraction.

12.     On June 9, 2025, Defendants, through their co-CEO and Chief Business and Legal Officer, Shilpa Patel, admitted via email that the communication sent by a "low-level" employee was inappropriate and offered an inadequate written apology addressing only a single defamatory statement, while ignoring the harm caused by the remaining defamatory statements concerning Dr. Gleicher's qualifications, CHR's methodologies, and CHR's SART scores. Plaintiffs rejected this partial and insufficient retraction.

13.     Following unsuccessful negotiations to secure a meaningful retraction, Defendants, on June 12, 2025, retaliated against Plaintiffs by threatening via email to notify the Patient and Tesla's benefits team that the Patient would be financially responsible for her treatment if Plaintiffs did not accept Defendants' inadequate retraction, thereby coercively attempting to compel the Patient to seek care from a Kindbody-owned or affiliated clinic unless Plaintiffs' accept Defendants' proposed retraction language.

14.     Defendants' misconduct reflects a systematic pattern of exceeding their administrative authority, violating their fiduciary obligations under ERISA, and engaging in unfair

competition through defamatory and misleading practices designed to harm competing providers and improperly benefit Defendants' own fertility clinics.

15.     Accordingly, Plaintiffs seek compensatory and punitive damages, treble damages, attorneys' fees under the Lanham Act and General Business Law §§ 349 and 350, and permanent injunctive relief explicitly prohibiting Defendants from further defamatory statements, compelling a comprehensive and unequivocal retraction, and barring future misuse of their fiduciary and administrative positions to secure improper competitive advantages.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 15 U.S.C. § 1121 because Plaintiffs assert claims arising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

17.     The Court has supplemental jurisdiction over the related state-law claims pursuant to 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy as the Lanham-Act claim.

18.     Defendants are subject to personal jurisdiction in New York under N.Y. C.P.L.R. § 302(a)(1) and (a)(3) and Fed. R. Civ. P. 4(k)(1)(A) because they transact business in New York, operate fertility clinics in this District, and committed tortious acts causing injury to Plaintiffs in New York.

19.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because Defendants maintain their principal place of business in Manhattan and a substantial part of the events giving rise to the claims, including receipt of the defamatory email and resulting injury occurred at Plaintiffs' Manhattan office, where the May 20 email was received and reviewed.

## THE PARTIES

20.    Plaintiff CHR is a world-renowned fertility center with its principal place of business located at 21 East 69th Street, New York, NY 10021.

21.    Plaintiff Dr. Norbert Gleicher is an individual residing in the State of New York and is the founder and Medical Director of CHR.

22.    Upon information and belief, Defendant Kindbody, Inc. is a Delaware corporation with its principal place of business located at 102 Fifth Avenue, New York, NY 10012.

23.    Upon information and belief, Defendant KBI Services, Inc. is a Delaware corporation with its principal place of business located at 102 Fifth Avenue, New York, NY 10012.

24.    At all times relevant herein, Defendants KBI Services, Inc. and Empire Medical Practice, P.C. acted as agents, subsidiaries, and/or alter egos of Kindbody, Inc., operating under its direction, control, and corporate policies.

25.    Upon information and belief, Empire Medical Practice, P.C. is a New York professional corporation with its corporate address at 102 Fifth Avenue, New York, NY 10012.

26.    Upon information and belief, Defendants operate as a unified business enterprise under common ownership and control: they share senior executives, maintain a single integrated website and brand, and commingle funds through a system-wide revenue pool. Corporate separateness is, therefore, maintained in form only.

## FACTUAL ALLEGATIONS

### A.    Dr. Gleicher and the Center for Human Reproduction

27.    CHR was founded by Dr. Gleicher in Chicago, Illinois in 1981, becoming the first IVF program in Chicago and the Midwest. CHR was later relocated to New York, New York.

28.    CHR is an internationally recognized fertility treatment and research center known for its work with uniquely complex infertility cases. CHR is a "center of last resort" for patients that face unique reproductive challenges.

29.    The women who seek CHR and Dr. Gleicher's services, including those under 40, typically present with low functional ovarian reserve and other complex fertility challenges that have proven refractory to treatment elsewhere. Many travel from outside the New York Tri-State area after exhausting local options.

**B.    Defendants' Conflicted Business Model and Financial Pressures**

30.    Defendants operate as a vertically integrated conglomerate founded in 2018 that occupies both sides of the fertility services marketplace, creating inherent conflicts of interest. Defendants market themselves as "the only fertility benefits provider that owns and operates its own clinics," thereby controlling both the referral process and the destination of those referrals.

31.    On one hand, Defendants contract to provide third-party employee benefits administrative services to large, self-insured companies that offer fertility and reproductive services as employee benefits, including fertility treatments such as IVF and IUI, fertility preservation services, third-party reproduction services, and adoption support.

32.    On the other hand, Defendants own a network of fertility clinics and laboratories in major metropolitan markets, with a partner network of affiliated clinics extending to geographic markets where owning facilities may not be economically viable.

33.    This dual role creates financial incentives for anticompetitive conduct: every patient Defendants divert from an out-of-network competitor to a Defendants-owned clinic increases Defendants' clinical revenue.

34.     Defendants use their position as third-party administrators for fertility benefits plans to funnel patients to their own clinics, even though they have a fiduciary duty as a plan administrator to act with impartiality and solely in the interest of the plan's participants, free from the influence of self-dealing or conflicts of interest.

**C.     Defendants' Statements Are False and Materially Misleading**

35.     Reyna Camberos is employed by Defendants located in Fontana, California and holds the title of "Patient Care Navigator".

36.     On May 20, 2025, Ms. Camberos sent an email to the Patient who had requested coverage for fertility treatment at CHR.

37.     The email states:

> In the interest of ensuring our members have the best patient experiences and outcomes possible, the ***Kindbody Network team*** wants to make you aware that ***the founding doctor at the Center for Human Reproduction is obviously an experienced practitioner in this field but is not specifically trained as a Reproductive Endocrinologist***.
>
> Additionally, ***this practice promotes unorthodox methods and cycle types***. Perhaps most importantly, ***the SART scores they report are consistently far below the national average***. For these reasons, ***this provider group does not meet criteria to be included in Kindbody's Network***.
>
> We understand that each person seeking reproductive health and family building services has unique needs and preferences and ***your plan does allow you to be seen anywhere you choose but we feel an obligation to keep our Kindbody members informed on matters of clinical quality***.
>
> Note that ***you have many options available to you in the New York market, including both Kindbody Signature clinics and many members of Kindbody's partner clinic network***. We encourage you to do your own research, ask us any questions you like, and let us know what you ultimately decide.

Please let me know if you would like a list of inetwork [*sic*] partner clinic within your ZIP code, I would be happy to assist you.

38.    The Kindbody Network team used the following defamatory statements about Plaintiffs to steer the Patient to a Kindbody clinic:  (a)  Dr. Gleicher is "not specifically trained as a Reproductive Endocrinologist"; (b) "this practice promotes unorthodox methods and cycle types"; (c) "the SART scores [CHR] report are consistently far below the national average"; and (d) "[f]or these reasons, this provider group [CHR] does not meet criteria to be included in Kindbody's Network."  Each of these statements made in Kindbody's May 20, 2025 email to the Patient is false or materially misleading.

### 1.    Defendants Statements Are False and Materially Misleading

#### a.    The Statement Regarding Dr. Gleicher's Training is False

39.    The claim that Dr. Gleicher is "not specifically trained as a Reproductive Endocrinologist" creates a false and misleading impression that Dr. Gleicher is not qualified or specifically trained to practice reproductive medicine. Dr. Gleicher began his career in reproductive endocrinology and immunology in 1974—four years before the first successful birth through IVF and at time before the current 36 month fellowship pathway had been established. Dr. Gleicher was instrumental in developing fundamental IVF techniques in the early 1980s that are still used today and is a leader reproductive medicine and an expert in the field of REI.

#### b.    The Statement Regarding "Unorthodox Methods" is False and Misleading

40.    The statement that CHR promotes unorthodox methods and cycle types suggests that CHR promotes the use of unorthodox, unapproved, or experimental treatments that are outside the standard of care or in place of treatments that are within the standard of care is false and materially misleading.

41.     Plaintiffs use and promote the use of standard treatment protocols for patients that are experiencing fertility issues and have not already tried and failed the standard treatment protocols.   The claim that CHR does not promote unorthodox treatment methods or cycle types is both false and materially misleading.

42.     Defendants knew or should have known that CHR is a research clinic that conducts clinical trials for innovative treatments under institutional review board oversight.   To advance this research mission, CHR offers evidence-based novel treatments to qualified patients who have exhausted conventional treatment options, which is precisely why patients come to CHR as a "center of last resort."

43.     As a research clinic, CHR has the advantage of being in a position to offer novel treatment protocols to qualified patients that have already failed conventional treatments or who have unique health issues that would disqualify that patient from the standard treatments.   While Dr. Gleicher has published many papers documenting novel fertility treatments, this does not mean that CHR promotes unorthodox treatment methods or cycle types over conventional treatments. Defendant's statement is, therefore, false, and materially misleading.

### c.   The Statement Regarding CHR's SART Score is Materially Misleading

44.     The data that SART published for CHR in 2023 shows that CHR treated 453 total cycles that year and had patients with the following age distributions:  (a) 196 patients were over age 42 (62.2% of total cases); (b) 365 patients were over age 40 (81% of total cases); and (c) only 22 patients were under age 35 (5% of total cases). The median age of CHR patients in 2023 was approximately 43 years old.

45.    According to the SART 2023 National Summary Report, the median age for patients receiving fertility treatment was approximately 36 years, with patients under 35 comprising 38% of cases nationally compared to CHR's five (5%) percent.

46.    This distinction is important because national CDC data shows that IVF success rates decline dramatically with age. According to CDC data, the live birth rate per intended egg retrieval for women under 35 is approximately 55.6%, compared to 40.8% for women 35-37, 26.8% for women 38-40, 12.6% for women 41-42, and only 3.9% for women over 42.

47.    With CHR's patient population being 81% over 40 compared to the national average of approximately 30%, and 49% over 42 compared to the national average of approximately 9%, any raw comparison of success rates without age adjustment is fundamentally misleading and inappropriate.

48.    SART warns users that its Clinic Summary Reports "should not be used for comparing clinics" because "differences in patient selection and treatment approaches may artificially inflate or lower pregnancy rates relative to another clinic." This disclaimer appears both on SART's website in the form of the "Understanding This Report" guide and as a pop-up every time a user accesses a clinic report. This same warning is prominently displayed on SART's website and appears as a popup each time a patient or user attempts to access a SART report from the website.

49.    In their May 20, 2025 email, Defendants ignored SART's guidelines for use of their reports by comparing CHR's SART scores with SART's National Summary Report to "inform" the Patient that CHR's "SART scores are consistently far below the national average", without providing any of the information necessary to put CHR's SART scores into context.

50.     Defendants clearly intended to lead the Patient and any reasonable person that may not be familiar with analyzing this data to believe that CHR is not a good choice to be their medical provider.   This is evidenced by the fact Defendants operate a large network of fertility clinics and clearly understand what these SART scores mean and how to interpret them, yet they intentionally choose to misuse CHR's SART report to create a false and materially misleading comparison for the purpose of steering the Patient to a Kindbody clinic.

### d.     The Statement Regarding "Network Criteria" is False and Misleading

51.     Defendants' statement that, "[f]or these reasons, this provider group [CHR] does not meet criteria to be included in Kindbody's Network" is also false and materially misleading. This statement creates the false impression that CHR was evaluated against objective, merit-based clinical quality standards and was found to be deficient.

52.     In reality, Kindbody's "network" is not a consortium of independent clinics selected for their excellence.  Upon information and belief, the network is comprised almost exclusively of clinics owned and operated by Kindbody itself, or affiliates in markets where Kindbody has no corporate presence. The primary "criterion" for inclusion is not clinical quality, but corporate ownership and affiliation.

53.     CHR, as a direct competitor located less than two miles from two of Kindbody's New York clinics, was never evaluated for inclusion Kindbody's network and never sought it.  The statement is not a good-faith assessment by Defendants, but is, instead, a deceptive commercial smear designed to create a false perception of superiority for Kindbody's own clinics and steer the Patient away from a direct competitor.

54.     Ms. Patel confirmed in writing that they reflected Kindbody's "internal qualifications" for network inclusion and that Kindbody's criteria include "certain SART scores"

and exclude physicians who are not board-certified reproductive endocrinologists. She then claimed that Kindbody will not accept doctors into their network that are not board certified. She then claims that Dr. Gleicher is not board certified and, therefore neither he nor CHR meet Kindbody standards.

55.    Upon information and belief, Defendants do not publish its criteria for network inclusion, instead maintaining a largely closed network comprised primarily of Kindbody-owned facilities and a network of partner fertility clinics that are in locations where Defendants do not operate its own corporate-owned "Signature Kindbody" clinic.

56.    Here, Defendants own and operate two "Signature Kindbody" clinics within 1.3 miles and 2.1 miles of CHR's offices. Both of these Signature Kindbody clinics complete directly with Plaintiffs. Upon information and belief, if Plaintiffs' do not meet the requirements to be included in the "Kindbody Network", it is for purely financial reasons having nothing to do with the quality of care provided Plaintiffs.

**D.    Defendants' Retaliation and Bad Faith**

57.    On May 22, 2025, Plaintiffs' counsel sent a cease-and-desist letter to Defendants demanding a full retraction of the defamatory statements. Due to shipping delays, the letter was not delivered to Defendants until May 27, 2025.

58.    On May 23, 2025, before Defendants had any notice of Plaintiffs' legal claims, Defendants sent a Negotiated Letter of Agreement ("LOA") wherein Defendants notified Plaintiffs that the Patient's treatments would be paid for by Defendants. This timing demonstrates that Defendants' decision to authorize coverage was made independently of any litigation concerns and cannot be characterized as an attempt to moot Plaintiffs' claims or avoid legal liability.

59.     On June 9, 2025, counsel for Plaintiffs and Defendants' co-CEO and Chief Business and Legal Officer, Shilpa Patel ("Ms. Patel"), held a telephonic conference to discuss the defamatory email.

60.     During this call, Ms. Patel acknowledged that the statements made by her employee were improper, dismissed the employee as "low-level," and represented that this was an "isolated incident."  Ms. Patel agreed to provide a written retraction for Plaintiffs' review

61.     Later that day, Ms. Patel sent a proposed retraction letter by email that was grossly inadequate. It addressed only one of the four core defamatory statements (the "unorthodox methods" claim) while completely ignoring the other damaging falsehoods about Dr. Gleicher's training and CHR's SART scores.

62.     On June 10, 2025, Plaintiffs' counsel advised Ms. Patel that Defendants' proposed retraction letter was insufficient because it did not address the core harms caused by the May 20 letter.  Due to these concerns, Plaintiffs rejected Defendants' proposed retraction.

63.     In a series of emails exchanged between June 10 and June 11, Ms. Patel attempted to justify Kindbody's false statement about Dr. Gleicher's training by defending these statements as being literally true and she refused to provide the necessary context in the proposed retraction for the SART scores, despite the data being publicly available from the CDC and SART.

64.     After Plaintiffs' counsel rejected Defendants' proposed retraction language and insisted on a full and fair retraction, Ms. Patel escalated the matter sending an email late on June 12, 2025, stating:

> We have agreed to write an apology to the patient retracting the statements made and have made an exception permitting the patient to obtain services at CHR outside of our network which cures any harm alleged. ***If this is not acceptable to your client, we will notify the patient and the Tesla benefit's team, if appropriate, of this matter and advise the patient that the patient will either be fully***

*responsible for all costs or will need to seek care from a Kindbody approved clinic if she wishes to use her Tesla benefit.*

65.     This threat was a bad-faith effort by Defendants to leverage their control over the Patient's medical care to shield Defendants from liability for their defamatory conduct and represents an independent act of tortious interference with Plaintiffs' relationship with the Patient.

66.     Defendants' threat is particularly coercive because it involves revoking coverage for fertility treatment that they had already approved on May 23, 2025, before they were even aware of this dispute.  This is clearly an act of retaliation and is intended to deprive the Patient of the care she needs from Plaintiffs and deprive Plaintiffs of at least $30,000 in revenue that would be generated from one IVF cycle—knowing that the Patient requires at least one IVF cycle to achieve pregnancy and likely more.

### E.     Defendants' Pattern of Systematic Misconduct

67.     In addition, Ms. Patel wrote in the email she sent to Plaintiff's counsel on June 12, 2025 that this issue was caused by "a junior member of our member services team [that] made a misstatement to a prospective patient of CHR".  The email sent by that junior employee was, however, expressly sent "on behalf of the Kindbody Network team" who wanted to make the Patient aware of certain false and misleading facts about Plaintiffs that were intended to steer the Patient to a Kindbody clinic.

68.     Upon information and belief, the Kindbody Network team uses Defendants' access to its client's benefits plans to steer plan members to clinics in Kindbody's network by any means necessary, including the use of false, misleading, and defamatory statements about the independent clinics that compete with Kindbody's network of clinics.

69.     The communications Defendants exchange with the 2.7 million plan members to whom Defendants owe a fiduciary duty are confidential and protected by HIPAA and other privacy

laws.  By sending emails like the one Defendants sent to Patient from its "Kindbody Network team", it is highly likely that other similar letters are sent regularly to patients, not out of concern for the quality of the patient's care, but to steer patients towards Kindbody clinics and partners within the Kindbody Network.

70.    This conduct constitutes a breach of Defendants' fiduciary duties under ERISA, which requires plan administrators to act "solely in the interest of the participants and beneficiaries" rather than to advance their own commercial interests. The particularly insidious nature of this misconduct stems from its undetectable character: because these communications occur through private, HIPAA-protected channels between Defendants and individual plan members, competing providers have no opportunity to monitor, detect, or respond to false statements being disseminated about their practices. Unless a plan member voluntarily discloses the communication (as occurred in this case) such conduct allows benefits administrators to undermine competitors' reputations while maintaining the facade of neutral administration.

71.    Defendants' willingness to use the Patient's medical needs as leverage demonstrates complete disregard for both the Patient's welfare and their duties as third-party benefits administrators. This conduct is especially egregious because Defendants claimed to act in the Patient's best interests while actually prioritizing their own financial interests over patient care and professional ethics.

72.    Defendants' conduct appears to part of a pattern of behavior ingrained in Defendants' corporate culture.  In 2023, Bloomberg News published a comprehensive three-part investigative series examining Defendants' business practices.  The series, titled "Embryo Errors, Flooded Clinics: Kindbody and IVF's Risky Business," documented systemic problems at Defendants, including understaffed clinics, inconsistent safety protocols, mislabeled and destroyed

embryos, and a corporate culture with dubious ethics that pressures Kindbody's doctors to meet quotas for lucrative procedures.

73.    According to the Bloomberg series, Defendants implemented a "profit mindset" that pressured physicians to increase the number of egg retrievals they performed, prioritizing financial targets over individualized patient care and creating potential conflicts between physicians' medical judgment and corporate financial goals.

74.    Bloomberg also reports that that the asset management company Fidelity Investments was reported to have declined to contract with Defendants for its employees' benefits because of the "misaligned incentives" at Defendants that drives the company to steer customers toward using its own clinics—precisely the conduct at issue in this case.

75.    Defendants' business practices have also drawn scrutiny from the United States Senate. On June 20, 2024, the Senate Committee on Health, Education, Labor, and Pensions (HELP) requested that the Department of Health and Human Services Office of Inspector General conduct an audit of at fertility clinics based in large part on the issues revealed in the Bloomberg investigation. The Senators' letter specifically referenced the Bloomberg investigation of Defendants.

**F.    Defendants' Violations of Benefits Administration Standards**

76.    The Employee Retirement Income Security Act ("ERISA") requires that third-party plan administrators act "solely in the interest of the participants and beneficiaries" and avoid conflicts of interest. ERISA § 404(a)(1) mandates that plan fiduciaries discharge their duties "with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries." Upon information and belief,

Defendants' business model systematically violates principles that govern neutral benefits administration.

77.    Upon information and belief, Defendants exceed their proper authority as benefits administrators by conducting "clinical quality" evaluations of healthcare providers that are not "Signature" Kindbody clinics or part of Kindbody's network of clinics—a function for which they lack medical training, clinical expertise, and legal authority.

78.    When plan documents permit members to choose their own providers, as is the case with Tesla's plan, Defendants have no authority to override that choice through disparagement or clinical quality assessments, particularly when the administrator operates competing facilities.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### (Defamation Per Se - On Behalf of Dr. Gleicher and CHR)

79.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

80.    On or about May 20, 2025, Defendants, through their employee and the "Kindbody Network team," published to a third party multiple false and defamatory statements of fact concerning Plaintiffs Dr. Gleicher and CHR.

81.    Specifically, Defendants' statement that Dr. Gleicher is "not specifically trained as a Reproductive Endocrinologist" constitutes defamation per se as it was intended to, and did, injure Dr. Gleicher in his profession by falsely impugning his qualifications, competence, and professional integrity.

82.    The foregoing statements were "of and concerning" Dr. Gleicher because Defendants' email specifically referenced "the founding doctor at the Center for Human

Reproduction." Dr. Gleicher founded CHR over 40 years ago and has served as its Medical Director throughout that period. By making this reference in their email to the Patient, Defendants clearly identified Dr. Gleicher personally, and the Patient, as well as any reasonable reader in the Patient's position, would understand that Defendants were referring explicitly to Dr. Gleicher.

83.    The statements were likewise "of and concerning" CHR because they expressly named the practice, disparaged its clinical methods and success rates, and were intended to deter the Patient and similarly situated plan members from selecting CHR for treatment.

84.    Dr. Gleicher's training occurred during the formative period of reproductive endocrinology as a recognized subspecialty, which was formally established by the American Board of Obstetrics and Gynecology in 1972-1973, when standardized fellowship programs were still being developed.

85.    Dr. Gleicher has published more than 500 peer-reviewed scientific papers in reproductive endocrinology and infertility, served as founding Editor-in-Chief of The Journal of In Vitro Fertilization and Embryo Transfer for over twenty (20) years, and is recognized internationally as one of the original IVF pioneers who developed groundbreaking techniques including the world's first transvaginal egg retrieval under ultrasound control.

86.    Defendant's statement ignores the historical context of subspecialty training and falsely suggests Dr. Gleicher lacks the qualifications that the medical community, academic institutions, and professional organizations have consistently recognized for over four decades.

87.    Defendant's statement is also particularly damaging because it uses the qualifier "specifically trained," which appears designed to create a false technical distinction that would mislead patients unfamiliar with the historical development of reproductive endocrinology

training. This phrasing was a deliberate attempt by Defendants to exploit the Patients' lack of knowledge about medical training pathways.

88.    Defendants' statements that Plaintiffs "promote[] unorthodox methods and cycle types" is also false and defamatory.

89.    On or about June 9, 2025, Defendants admitted the falsity of their defamatory statements in a email from Ms. Patel to to Plaintiffs' counsel where Defendants explicitly acknowledge making a "misstatement" in claiming that CHR "promotes unorthodox methods and cycle types" and offered an apology for this "misstatement." This written admission confirms that Defendants knowingly published false and defamatory statements about Plaintiffs.

90.    Defendant's statement is that, "[p]erhaps most importantly, the SART scores [Plaintiffs] report are consistently far below the national average."

91.    This statement is false, materially misleading, and defamatory because it omits the essential context that over 75% of CHR's patients are over age 40 with a median age of 43-45 years, compared to the national median age of 36, and that CHR specializes in treating patients whom most fertility centers refuse to accept due to advanced age.

92.    SART explicitly warns that clinic data "should not be used for comparing clinics" because differences in patient selection "may artificially inflate or lower pregnancy rates," yet Defendant deliberately presented CHR's age-adjusted outcomes as evidence of clinical incompetence without disclosing the demographic factors that explain the statistical differences, thereby creating a false and misleading impression of CHR's professional competence in violation of established industry standards.

93.    Defendants' statement that CHR "does not meet criteria to be included in Kindbody's Network" was made by Defendants with the intent to attack the quality and

effectiveness of its medical services and its business integrity, thereby deterring patients from dealing with it.

94.    Upon information and belief, Kindbody does not publish clear, objective criteria for network inclusion, instead maintaining a largely closed network comprised primarily of Kindbody-owned facilities, which supports Plaintiffs' contention that the purported 'quality assessment' was pretextual and commercially motivated.

95.    While each of these statements is independently defamatory, when taking together the harmful effects of these statements are amplified.

96.    This was, however, not an email sent by an objective third-party administrator acting in Patient's best interests, but by an employee for Defendant assigned with the task of steering Plaintiffs' patient to a "Signature" Kindbody clinic or affiliated clinic within its network.

97.    Furthermore, the defamatory statements concerning Dr. Gleicher's qualifications directly and foreseeably harmed the business and reputation of CHR, as the goodwill and reputation of a specialized medical practice are inextricably linked to that of its founder and medical director.

98.    Defendants published these statements with actual malice, knowing their falsity or with reckless disregard for the truth, as evidenced by their access to Dr. Gleicher's well-documented credentials, SART's guidelines prohibiting raw score comparisons, and their pattern of disparaging competitors.

99.    As a direct and proximate result of Defendants' defamatory statements and retaliatory actions, Plaintiff Dr. Gleicher has suffered significant harm to his personal and professional reputation, and Plaintiff CHR has suffered significant harm to its business reputation and goodwill, for which Plaintiffs are entitled to compensatory and punitive damages.

## SECOND CAUSE OF ACTION

### (Trade Libel - On Behalf of CHR)

100.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

101.    Defendants knowingly published false and disparaging statements about the quality of CHR's services, namely that CHR's SART scores "are consistently far below the national average"; that CHR "promotes unorthodox methods and cycle types"; and that CHR does not meet criteria to be included in Kindbody's Network.

102.    These statements were made with malice and with the intent to cause financial harm to CHR by interfering with its relationship with the Patient and, upon information and belief, other potential patients that participate in the employee benefits plans administered by Defendants.

103.    CHR has suffered special damages, including threatened loss of at least $30,000 in revenue from the Patient's IVF treatment due to Defendants' threat to revoke coverage, plus additional unquantifiable losses from similarly situated plan members who, upon information and belief, received comparable communications but did not report them to CHR.

## THIRD CAUSE OF ACTION

### (False Advertising - Violation of Lanham Act § 43(a))

104.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

105.    On May 20, 2025, Defendants sent an email to the Patient that contained multiple false and misleading statements about Plaintiffs and the medical services they provide.

106.    The May 20 email travelled in interstate commerce because it was sent from California to New York, thereby invoking federal jurisdiction under 15 U.S.C. § 1125(a).

107.    Upon information and belief, although addressed to a single plan member, the May 20, 2025 email was sent pursuant to Defendants' standardized "Kindbody Network Team" script and follows a standardized format that is part of Defendants' marketing strategy and is disseminated to every plan member nationwide who requests out-of-network authorization for fertility services.  Such routine, ongoing solicitation of patients to choose Defendants' clinics over independent competitors constitutes "commercial advertising or promotion" within the meaning of 15 U.S.C. § 1125(a)(1)(B).

108.    The email also falsely suggests that Plaintiffs "do not meet the criteria to be included in Kindbody's network."

109.    The statements made by Defendants in the May 20, 2025 letter created a false and misleading comparison between the quality of Plaintiffs' and Defendants' respective medical services with the intent to show Defendants in a favorable light at Plaintiffs' expense.

110.    The email was intended to influence the Patient to discontinue services with Plaintiffs and use Defendants' services or those of their network partners.

111.    Upon information and belief, Defendants operate in all 50 states, manage health plans for nationwide employers such as Tesla, SpaceX, Rivian, Activision, FanDuel, Medtronic, Baker Hughes, GAF, Walmart, and many others.  Defendants also own and operate or are affiliated with fertility clinics across the country.

112.    Upon information and belief, Kindbody is the third party administrator for approximately 132 employers covering over 2.7 million plan members.

113.    Defendants' actions violate the Lanham Act § 43(a), entitling Plaintiffs to damages, treble damages, attorneys' fees, and injunctive relief.

**FOURTH CAUSE OF ACTION**

**(Deceptive Business Practices and False Advertising - N.Y. GBL §§ 349 & 350)**

114.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

115.    Pursuant to New York General Business Law ("GBL") §§ 349 and 350, Defendants have engaged in deceptive acts and practices and false advertising directed at consumers in the state of New York.

116.    Defendants' deceptive conduct includes, but is not limited to: (a) disseminating false and misleading information about the professional qualifications, medical methods, and treatment success rates of their competitors, including Plaintiffs; (b) misrepresenting their own role as neutral benefits administrators while actively steering patients to their own clinics; and (c) failing to disclose their direct financial conflict of interest when providing purported "clinical quality" assessments to patients.

117.    Defendants' email to the Patient was sent "on behalf of the Kindbody Network team," indicating this was not an individual employee action but a coordinated corporate response to the Patient's request to have her benefits applied to a provider that is not part of the Kindbody network—as was the patient's right under the terms of her benefits plan.

118.    Defendants' deceptive conduct was consumer-oriented because it systematically provided false and misleading information about healthcare providers to plan members making critical medical decisions. This conduct affects the healthcare marketplace broadly by creating unfair competitive advantages through deception of consumers who rely on Defendants' purported expertise as benefits administrators.

119.    By providing false and misleading information about medical providers from a position of trust as a third-party benefits administrator, Defendants' conduct subverts the public interest in a transparent healthcare market.

120.    Defendants' actions directly impair the ability of consumers to make free and fully informed decisions about their own critical medical care, a matter of significant public concern.

121.    The false statements and omissions made by Defendants were materially misleading and constituted false advertising because they were likely to deceive a reasonable consumer into believing that CHR was an unqualified provider and that Kindbody's own clinics were superior, all while concealing Defendants' financial motivation to steer patients to their own facilities.

122.    As a direct result of Defendants' deceptive acts and practices and false advertising, Plaintiffs have suffered injury, including, but not limited to the diversion of prospective patients and the expenditure of resources to counteract the false information disseminated by Defendants into the marketplace.

123.    Defendants' violations of GBL §§ 349 and 350 were willful, knowing, and intentional. Plaintiffs are therefore entitled to their actual damages, and the Court may, in its discretion, award treble damages up to one thousand dollars per violation, and award Plaintiffs their reasonable attorneys' fees. Furthermore, a permanent injunction is required to prevent ongoing and future harm to the public.

**FIFTH CAUSE OF ACTION**

**(Tortious Interference with Prospective Business Relations)**

124.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

125.    Plaintiffs had a valid and prospective business relationship with the Patient, who, after a consultation, had selected CHR for her medical care. Furthermore, Plaintiffs have a reasonable expectation of business relationships with the entire class of Tesla employees, and other employees covered by Kindbody-administered health plans, who are permitted to choose their own fertility care provider.

126.    Defendants had actual knowledge of Plaintiffs' specific prospective business relationship with the Patient because she directly informed them of her choice to receive care at CHR. Defendants also knew of Plaintiffs' prospective relationship with the broader class of plan members by virtue of their role as benefits administrator for large employers like Tesla.

127.    Defendants intentionally and maliciously interfered with these business relationships by employing wrongful means.

128.    The "wrongful means" consist of, at a minimum, the multiple defamatory and false statements published in the May 20, 2025 communication to the Patient, which were designed to induce the Patient to abandon her relationship with Plaintiffs and instead use a Kindbody-owned facility.

129.    Furthermore, after Plaintiffs refused to accept Defendants' inadequate settlement terms, Defendants engaged in a second, distinct act of tortious interference.

130.    On or about June 12, 2025, Defendants, through their Co-CEO and Chief Legal Officer, intentionally and improperly interfered with the relationship between Plaintiffs and the Patient by threatening to revoke the Patient's already-approved insurance coverage under the Letter of Agreement.

131.    This threat constituted an independent wrongful act of economic pressure, designed to coerce Plaintiffs, retaliate against them for asserting their legal rights, and further disrupt their relationship with the Patient.

132.    As a direct and proximate result of Defendants' wrongful interference, Plaintiffs' relationship with the Patient was jeopardized, requiring legal intervention to preserve it. Furthermore, Plaintiffs' prospective business relationships with the broader class of plan members have been harmed.

133.    Based on the foregoing, Plaintiffs have suffered damages and are entitled to compensatory and punitive damages for Defendants' willful and malicious interference.

## JURY DEMAND

134.    Plaintiffs hereby demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants as follows:

a)    Awarding compensatory damages in an amount to be determined at trial, but not less than $1,000,000;

b)    Awarding punitive damages in an amount sufficient to punish Defendants for their willful, malicious, and fraudulent conduct and to deter similar conduct in the future;

c)    Awarding treble damages and attorneys' fees pursuant to 15 U.S.C. § 1117;

d)    Awarding attorneys' fees pursuant to New York General Business Law §§ 349 and 350;

e)    Granting a permanent injunction requiring Defendants to: (i) issue a full and complete retraction, in a form approved by the Court, of the defamatory statements made against Plaintiffs; (ii) permanently cease and desist from making false or misleading statements about Plaintiffs; and (iii) refrain from using their role as benefits administrators to steer patients away from CHR or any other providers that are not part of the Kindbody network of affiliated providers through false, misleading, or disparaging communications;

f)  Awarding Plaintiffs the reasonable costs of corrective advertising required to counteract Defendants' false statements, together with such declaratory relief as the Court may issue under Fed. R. Civ. P. 65 and 28 U.S.C. § 2202;

g)  Pursuant to Fed. R. Civ. P. 65(c), waiving the security requirement altogether, because the injunction merely compels Defendants to refrain from unlawful conduct and imposes no monetary or operational burden on them;

h)  Awarding Plaintiffs their costs and disbursements in this action; and

i)  Granting such other and further relief as the Court deems just and proper.

Dated: Uniondale, New York
June 23, 2025

TURMAN LEGAL SOLUTIONS P.C.

By: *Stephen Turman*
Stephen E. Turman
626 RXR Plaza
Uniondale, NY 11556
(516) 266-6101
sturman@turmanlegal.com

*Counsel for the Plaintiffs Dr. Norbert Gleicher and American Infertility of New York, P.C. d/b/a Center for Human Reproduction*

28